Filed 6/4/15  P. v. Valenciz CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B252996 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA124850) |
| v. | |
| JUAN DIEGO VALENCIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Kelvin D. Filer, Judge.  Modified and affirmed with directions.

Joseph Shipp, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, and Erika D. Jackson, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Juan Diego Valencia appeals from the judgment entered following a jury trial in which he was convicted of second degree murder and evading an officer with willful disregard. Defendant raises numerous contentions of error. We agree he was subject to two, not four, prior prison term enhancements, but otherwise affirm.

## BACKGROUND

**1.     Events preceding shooting**

Selene Mayoral, aged 24, lived with her parents and worked part-time at Kenwood. On the evening of September 5, 2012,[1] Selene told her mother, Graciela Mayoral, that she was going out with a male friend from work and would be back the next day. Selene packed a bag with clothing that she said she intended to launder and left the family home on foot. Mrs. Mayoral was concerned about Selene because she had been staying with friends a lot, and Mrs. Mayoral feared Selene had relapsed into using methamphetamine, as she had when she was a teen.

About 3:00 p.m. the next day, Mrs. Mayoral spoke to Selene by phone and all was well. Selene said she was sleepy. Selene phoned Mrs. Mayoral around 5:00 p.m., but Mrs. Mayoral missed the call. She called Selene back about 20 times, but Selene did not answer. At 5:32 p.m., Selene sent Mrs. Mayoral a text message asking to be picked up. A little later, they spoke about Selene's location. Selene said the address was written down in her room, but Mrs. Mayoral did not find it. Selene told her she was in Hawthorne on Chadron and 139th Street. Selene said someone wanted to take her cell phone, and Mrs. Mayoral told her to "tell the gentleman who had her to return her to me. If not I would call the police."

Selene's father's drove to the area, and Selene and Mrs. Mayoral exchanged several text messages around 5:55 p.m. One said, "'Mom, I'm going.'" Nonetheless, Selene's father returned home without her. Selene phoned her mother around 6:30 p.m. and said "they" were threatening her and keeping her in a dark room, and she could not

---

[1] Undesignated date references pertain to 2012.

2

leave. Later, Selene called her mother from a different phone and said her cell phone had been taken. Mrs. Mayoral heard Selene telling "Juan" not to hurt her, to let her go home to her mother, and that she believed he was good. Thereafter, Mrs. Mayoral heard "conversation back and forth." Selene then said, "'I'm okay, the person is taking me home.'" Mrs. Mayoral said she was at Selene's location; Selene told her to leave because Juan did not want her to know where he lived. The last thing Mrs. Mayoral heard was Selene screaming.

At 8:11 p.m. Mrs. Mayoral sent Selene a text message telling her to come outside where they were waiting for her. There was no response and Selene did not emerge. Mrs. Mayoral went onto the grounds of one of the apartment buildings on the block and asked people about Selene, but no one had information. Mrs. Mayoral kept looking and yelling. She saw two men carrying Selene's bag, ran up to them, and grabbed the bag from them. They claimed they had merely found the bag and denied knowledge of Selene.

**2.     The shooting, pursuit, and dumping of the victim's body**

Deputy Jonathan Montes was on patrol in Lynwood in a marked Sheriff's Department car at 11:15 p.m. on September 6 when he saw a green Mercury driving with its high-beam headlights on. After the car made an unsignaled left turn, Montes followed it. Montes could see there were two occupants who appeared to be conversing. Montes turned on his flashing lights to effect a traffic stop. The Mercury pulled to the curb, and Montes parked one or two car lengths behind it. Montes immediately saw a flash of light inside the Mercury and heard a gunshot. The Mercury then sped away.

Montes pursued the Mercury with all of his car's emergency lights on and radioed for assistance. Soon, several other sheriff's patrol cars and a helicopter joined the pursuit. The Mercury drove in excess of the speed limit and ran several stop signs and a red light. As the Mercury made a turn, Montes saw the passenger's head slide toward the center of the car, but he never saw it come back up.

The Mercury slowed as it reached the intersection of Josephine and Harris Streets in Lynwood, then came to a stop. Montes stopped his patrol car behind it. The driver of the Mercury, whom Montes identified at trial as defendant, reached across the car, opened the passenger-side door, pushed the passenger (Selene) out into the street, then drove away. A video recording of this was played at trial.[2]

Most of the deputies resumed the pursuit of the Mercury, but several stopped where the body was dumped. Deputy Victor Rascon testified Selene appeared to be dead when he first saw her. Paramedics later pronounced her dead at the scene.

Pursued by Montes and many other deputies, defendant drove west on the 105 Freeway at an average of 85 miles per hour and drove to 14005 Chadron Avenue in Hawthorne. Defendant stopped his car in the middle of the street and ran toward an apartment building, leaving the engine and headlights on and the driver's door open. Montes saw a gun fall from defendant's "waistband area" onto the ground. The gun was a loaded .45-caliber Colt semiautomatic.

Montes testified the entire pursuit, from the time he originally stopped the Mercury until defendant abandoned the car, lasted 20 to 25 minutes.

3.      **Defendant's arrest, postarrest statements, and conduct**

Montes and Deputy Nikolai Vavakin pursued defendant on foot and saw him enter a third floor apartment. Vavakin kicked in the door of the apartment and saw defendant standing in front of him. Vavakin ordered defendant to come out, but defendant ran out of sight. Defendant's cousin, Jesse Valencia, came out, but defendant ignored the deputies' orders to surrender. The deputies summoned a special team that had police dogs, and defendant eventually surrendered and was arrested. Thereafter, defendant's half brother also emerged from the apartment.

---

[2] Outside the presence of the jury, the prosecutor informed the court this video recording was made by "a citizen" who was "at the corner anticipating the pursuit route."

4

Deputies Christopher Gomez and Brandon Patin escorted and guarded defendant at the scene. Patin told Gomez he was waiting for a gunshot residue (GSR) kit before putting defendant into a patrol car. Defendant then made a spontaneous statement to which both deputies testified. According to Patin, defendant said, "'You're going to execute me. If you're going to execute me look me in the face when you do it. I looked at her.'" According to Gomez, defendant said, "'Oh, you're going to GSR me? You're going to execute me? If you're going to execute me you should look at me in my face like I looked at her.'"

Patin testified defendant made another spontaneous statement as he and Gomez were driving defendant to the command post: "'You're going to shoot me in the head like I did her.'" Later, as the deputies were taking Jesse Valencia out of Patin's patrol car to put defendant in that car, defendant said to Jesse in a low voice, "'Hey, fool, I killed her.'"

Gomez testified that defendant at some point spontaneously said, "'Hey, I know you're going to execute me. If you're going to do it, do it in my head like I did her.'"

Patin testified that before he took defendant out of his car at the sheriff's station, defendant asked, "'Did you know Blair?'" Patin did not answer, and defendant said, "'We will be remembered forever because we killed Blair. We killed the deputy.'" Patin then realized defendant was talking about Deputy Steven Blair, who had been killed by a member of the Young Crowd gang in 1994.

During the booking process, defendant admitted he was a member of the Young Crowd gang and he made a gang hand signal while Patin photographed him. Defendant also said he lived in the apartment from which he was extracted and he had used methamphetamine on September 6.

4.      **Search of the car and the apartment**

The front passenger window in the Mercury was shattered and there was glass on the center console and dashboard, as well as on the passenger seat. There was also a great deal of blood in the car, and an expended .45-caliber casing was found lodged

5

between the rear seat and the car frame. Deputies found Selene's identification inside a wallet in a purse on the floorboard of the Mercury. A glass smoking pipe was on the driver's seat. Deputies did not find any cell phones in the car, but there were three in the bathroom in defendant's apartment. The batteries had been removed from two of the phones. There was blood on the wall of the bathroom. In the only bedroom in the apartment, deputies found defendant's identification, a glass smoking pipe, two handguns in the pockets of a jacket in the closet, and "Young" and "Crowd" written on a pad of paper. In a cabinet in the hall, deputies found assorted ammunition, a loaded magazine for a .45-caliber gun, and a magazine for a .25-caliber gun.

### 5.    Forensic evidence

Deputy Medical Examiner Paul Gliniecki, who performed the autopsy on Selene, testified she had been shot through the head, with the bullet entering her left ear and exiting behind her right ear. The trajectory of the shot was left to right, 10 degrees downward, and 20 degrees front to back. The presence of soot and absence of stippling demonstrated it was a contact shot, i.e., the gun was close to the skin. It would have been "rapidly fatal."

Gliniecki noted numerous contusions and abrasions on Selene's body, including abrasions above her right eye; abrasions on the right side of her neck extending onto her shoulder; a diamond shaped abrasion below her chin "consistent with possible ligature"; ligature marks on her neck with and abrasions around those marks, possibly from fingernails; abrasions and contusions on her upper left chest; and contusions on her right arm above her elbow and on both hands. Her inner lip was lacerated. In response to a hypothetical question regarding a woman's body being pushed out of a car onto the street approximately 16 minutes after she was shot through the head, Gliniecki testified he would not expect to see all of the bruising he saw on Selene.

Testing revealed Selene had methamphetamine and amphetamine in her system.

Sheriff's firearms examiner Tracy Peck examined and test-fired the .45-caliber Colt recovered by deputies. She discovered it had both a manual thumb safety lever and

an unusual grip safety. The latter must be depressed by holding the rear of the grip in order to fire the gun. In addition, the trigger had to be pulled all the way back to fire the gun, which required three and one-quarter pounds of pressure. The gun was working properly. Peck also compared casings obtained from test-firing the gun to the casing recovered from the Mercury and determined the Colt had ejected the casing that was in evidence.

### 6. Gang evidence

Gang Detective Grant Roth testified as the prosecution's gang expert regarding Young Crowd, a Hispanic criminal street gang on the east side of Lynwood with about 100 members. In September of 2012, Young Crowd's rivals were the Neighborhood Crips, Cross Atlantic Piru, and South Side Lynwood. Roth opined that the primary activities of the Young Crowd gang are vandalism, narcotic sales, batteries, street robberies, murders, carjackings, extortion, and shootings. Roth further opined gangs strive to intimidate both their rivals and the residents of the area claimed by the gang because doing so allows the gang to commit crimes without fear of being reported to the police and prevents rival gangs from taking over their territory and recruiting new members from within their territory. Roth also testified it was becoming increasingly common for gang members to live outside of the territory claimed by their gang. Doing so shielded them from police pressure to some extent.

Although Young Crowd was one of the gangs upon which Roth claimed expertise, he had never met or heard of defendant. A fellow detective knew defendant to be a member of Young Crowd known as Scarface and had heard that defendant had a reputation within the gang as a shooter. Defendant had several tattoos related to the gang, including "Y" and "C" on his abdomen and on each bicep; "Lynwood" with bullet holes depicted over the "n," signifying disrespect to the rival Neighborhood Crips; and "SSLA" on his leg, meaning South Side Los Angeles and signifying allegiance to the Mexican Mafia. Roth opined defendant was a member of the Young Crowd gang.

According to Roth, the location where Selene's body was dumped was within the territory claimed by the Neighborhood Crips. In response to a hypothetical based upon the prosecution's evidence, including that the victim was held against her will prior to the shooting, Roth opined that the homicide was committed for the benefit of the Young Crowd gang. He explained that because the victim was killed in Lynwood, the body was dumped in the territory of a rival gang in a "display of force," and the shooter had associated the instant killing with a deputy's murder, the homicide would enhance the gang's reputation for violence, and thereby intimidate rival gangs, the community, and even law enforcement officers.

### 7.    Defendant's testimony

Defendant testified he grew up in Lynwood and only joined the Young Crowd gang for protection after he was shot in the face at a restaurant. At the time of trial he no longer considered himself an active member of the gang.

Defendant admitted that he had served time in prison for three drug-selling convictions, and on cross-examination he admitted he also had been convicted of possessing a gun and evading the police. He obtained his first tattoos in prison in 2005 and liked them, so he kept getting more. Some of his tattoos were gang-related and others were not.

Defendant testified he had been using methamphetamine on and off since 2003, though not while he was incarcerated. He resumed in April of 2012 and was using one to two grams per day, which members of his gang gave him for free "just [to] show [him] love."

Defendant testified that he met Selene at Kenwood in February of 2012. Two or three months later, they began spending every other weekend together. They always used methamphetamine when they were together.

Defendant picked up Selene and her friend Betty on September 5. Defendant's cousin Jesse was also at the apartment. On September 6 defendant went to work in the morning and got home around 5:00 or 5:30 p.m. He made food, then they got high.

8

When defendant ran out of methamphetamine, Selene said she wanted to go home. He did not care whether she left, but he told her to get a ride from someone else because there was too much traffic. Selene called her mother. Defendant did not know what she said to her mother, but she left around 7:00 or 8:00 p.m.

Defendant called a friend and arranged to visit the friend at home. As he left around 8:00 p.m., he saw Selene standing in the lobby of the apartment building. She got in defendant's car when he told her he was going to pick up more drugs. They went to the friend's house, then to a gas station, where they got high.

While they were driving through Lynwood defendant noticed a police car behind him. He was worried because he had a loaded gun under the seat of his car. He pulled over and told Selene to hide the gun. Holding the gun by the slide with the barrel pointed forward, toward the windshield of the Mercury, defendant handed her the gun. He felt their hands touch, but he was looking in the rear view mirror, not at Selene. He heard a loud bang, saw muzzle flash, and felt the gun discharge. Defendant testified he thought someone, perhaps the deputy behind him, was shooting at him from outside the car, so he sped away. He insisted he did not know Selene had been shot and denied that he shot her. Later, as he made a turn, she slid toward him. He tapped her to see if she was okay. He thought she was ducking, but eventually realized she was slumped over and must be injured. Defendant saw people standing at the corner of Josephine and Harris and thought they could help Selene, so he pulled over and gently pushed her out.

Defendant drove home because he was thirsty and he thought he would be safe there. When he parked his car outside his building, he knew the police were still chasing him, so he ran to his apartment. He drank some milk, then went in the living room. He did not know what happened with the gun because he did not have it at any point after he handed it to Selene. When Vavakin kicked in the door and aimed a gun at defendant, defendant thought Vavakin was going to shoot him, so he ran and hid in the bathtub. He heard deputies say they were going to shoot him and "sink him," so he thought they intended to kill him. After he came out, he heard deputies refer to "GSR" and thought it

9

meant kill him. He recalled telling a cameraman that they were going to execute him, but did not remember telling the deputies to look him in the eye.

Defendant told the deputies he was high, but they did not test him for drugs. He remained numb for two weeks, after which he mourned Selene. He admitted that when he spoke to detectives, he told them that the only thing he remembered was driving around.

## 8. Verdicts and sentencing

The jury convicted defendant of second degree murder and evading an officer with willful disregard. With respect to the commission of the murder, the jury found defendant fired a gun, causing death, but found the gang enhancement allegation was not true. The jury also found four Penal Code section 667.5, subdivision (b)[3] prior prison sentence enhancements true. The court sentenced defendant to prison for an aggregate term of 47 years to life, consisting of consecutive terms of 15 years to life for murder, 25 years to life for the gun enhancement, 3 years for evading, and 4 years for the prior prison sentence enhancements.

## DISCUSSION

## 1. Denial of motion to bifurcate trial of gang enhancement allegation

Before trial, defense counsel sought to bifurcate trial of the gang enhancement. The prosecutor opposed, telling the court that the gang evidence was relevant to proof of defendant's intent to kill because it explained why the body was dumped at the particular location and why defendant referred to a prior crime committed by his gang.

The trial court declined to bifurcate, saying: "I certainly understand the defense'[s] concern, but I have to recognize the reality of apparently the evidence that's going to come in, and it appears that there are statements or evidence that the People intend on using to show why the offense may have been committed, why certain things were done, why certain things were said. [¶] And it appears to the Court that the gang

---

[3] Undesignated statutory references are to the Penal Code.

evidence is inextricably tied in and connected with the evidence regarding the People's case in chief. And I found that when you do voir dire on the gang issues that we're able to get jurors who can separate that. So I think it is important that the jury is aware of it up front and that they aren't ambushed or surprised or challenged by that information coming out unannounced. [¶] So I'm going to overrule the defense objection. However, I am going to voir dire on that issue and I'll allow counsel to voir dire as well. And also, if the defense requests, my intentions would be to give a limiting instruction as to how they're to consider that evidence."

Defendant contends that the trial court erred by denying defendant's motion to bifurcate trial of the gang enhancement allegation. He argues that although the jury did not find the gang enhancement allegation true, presentation of the gang evidence prejudiced the jurors against him and influenced their "determination on significant issues of accident or gross negligence turning on [defendant's] credibility." He contends this error violated his right to due process.

### a.    Pertinent principles of law

A gang enhancement allegation differs from a prior conviction allegation, in that it is "attached to the charged offense and is, by definition, inextricably intertwined with that offense." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048 (*Hernandez*).) The need for bifurcation of a gang enhancement allegation is therefore far less than that for a prior conviction allegation. (*Ibid.*) Where the gang evidence is "relevant to, and admissible regarding, the charged offense" there is no need to bifurcate, "[e]ven if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself." (*Id.* at pp. 1049–1050.) The trial court's discretion to deny bifurcation of a gang enhancement is broader than its discretion to admit gang evidence when no enhancement is charged, and a defendant must "'clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.'" (*Id.* at p. 1050.)

We review the trial court's ruling for an abuse of discretion, in light of the record that was before the trial court at the time of the ruling. Even if the trial court's ruling was correct at the time it was made, however, reversal is required if the defendant shows the failure to bifurcate resulted in "'"'gross unfairness' amounting to a denial of due process."'"" (*People v. Burch* (2007) 148 Cal.App.4th 862, 867 [bifurcation of section 667.5, subdivision (b) prior prison term allegation].)

**b.      The trial court did not abuse its discretion**

Defendant cast Selene's shooting in the light of a gang-related crime by his spontaneous statement to Patin that his gang would be remembered forever because they killed Deputy Blair. The theory subsequently developed by the prosecutor that the crime was gang-related was supported by certain attributes of the crime, such as the brazenness of shooting her in front of a deputy sheriff and pausing during a police chase to dump her body in the territory claimed by a rival gang, in full view of pursuing deputies. If defendant's motive for killing Selene was a gang-related reason, it would show he intended to kill and completely undermine his accident defense. Thus, at least some of the gang evidence was cross-admissible on the issues of intent and motive. Accordingly, we cannot conclude the trial court abused its broad discretion by declining to bifurcate.

**c.      Defendant was not prejudiced by a unitary trial**

Even if we were to conclude the trial court erred by denying bifurcation, we necessarily would conclude such error was harmless beyond a reasonable doubt. First, the mere fact that the jury did not find the gang enhancement to be true indicates it was not swayed by the gang evidence.

Furthermore, evidence of defendant's guilt was overwhelming. Although defendant refers to the existence of "live identification issues," there was no question that defendant was the person in the car with Selene when she was fatally shot. Not only was he observed by Montes, he also admitted that he and Selene were in the car together at the time. Thus, there were no identification issues, "live" or otherwise. The jury's determination in this case instead turned on a single issue: Did defendant intentionally

12

shoot Selene or was the shooting an accident?[4]  If defendant intentionally shot Selene, additional aspects of his mental state, such as premeditation, were also at issue.

The two versions of events presented to the jury were not equally credible, as defendant suggests by characterizing this as "an unusually delicate intent/malice/credibility case."  The prosecution's theory of an intentional shooting was supported by defendant's several postarrest statements to deputies and to his cousin that he had killed or shot Selene and had looked her in the face when shooting her.  It was also supported by the forensic evidence.  Selene was killed by means of a contact shot through her left ear, with a slight front to back trajectory, which would have been extremely difficult—perhaps impossible—for her to inflict upon herself, especially given that she was right-handed.  Self-infliction of such a shot was even less plausible in light of the grip safety on the Colt, which required holding the back of the gun's grip to depress that safety, and the three and one-quarter pound trigger pull.  Defendant's alternative theory of accidental discharge during the gun handoff was even more implausible, given the location and trajectory of the bullet wound, that it was a contact wound, and the necessity of depressing the gun's grip safety and fully retracting the trigger with three and one-quarter pounds of force.

Numerous aspects of defendant's testimony further reduced his credibility, and thus the likelihood of the jury's acceptance of his accidental discharge theory.  First, defendant's claim that he thought someone outside the car, possibly Deputy Montes, was shooting at him was both inherently implausible, given the large caliber of the gun and the extremely close proximity in which it was fired, and contradicted by defendant's own testimony that he felt the gun discharge.  Defendant also testified that he did not have the gun and did not know what happened to it after he handed it to Selene, yet Montes testified he saw the gun fall from the vicinity of defendant's waistband when defendant fled from his car outside the apartment building and the gun was recovered from just

---

[4] Defendant did not claim Selene purposely shot herself.

13

outside the driver's door of the Mercury. Other inherent implausibilities in defendant's testimony included that he pushed Selene's body out of the car so bystanders could help her, and that he drove home at the end of the pursuit because he was thirsty and thought he would be safe there. Defendant's failure to tell investigators that the gun must have discharged accidentally during handoff also detracted from his credibility, as did his prior felony convictions, which the jury was instructed it could consider with respect to a witness's credibility. (CALCRIM No. 226.)

In addition, the bruises and ligature marks on Selene clearly indicated someone had abused her, and as far as the record revealed, defendant was the only one of the three people at the apartment that knew Selene or interacted with her.

In light of the highly implausible defense and the forensic evidence supporting the prosecution's theory of an intentional shooting, any error in failing to bifurcate trial of the gang enhancement was harmless beyond a reasonable doubt.

## 2. Denial of motion to exclude victim's and mother's statements on telephone

Prior to trial, defendant sought to prevent Mrs. Mayoral from testifying to the contents of her telephone conversations with Selene while Selene was in defendant's residence on the ground such testimony would be hearsay. The prosecutor argued it was relevant to Mrs. Mayoral's state of mind and her conduct. Defendant argued Mrs. Mayoral's state of mind and conduct were not relevant. The prosecutor then argued the conversations were relevant to "defendant's state of mind at the time of the shooting and what's happening when he decides to shoot her," in that defendant was holding Selene hostage and thought Mrs. Mayoral had called the police.

The trial court denied exclusion, saying, "[I]t does appear that the exception to the hearsay that's coming in not for the truth of the matter asserted but to explain the mother's conduct, and also, I think it is somewhat circumstantial to connect the victim, the location of the victim, where she might have been and where she was at the time the officers made the observations they did, and even the defendant's action at the time of the

14

shooting. . . . But I will give a limiting instruction to the jury as to how they are to consider that evidence."

The court seemingly forgot to give the promised limiting instruction, and counsel did not request such an instruction.

Defendant contends the trial court erred by permitting Mrs. Mayoral to testify that Selene said someone wanted to take her cell phone away and later that someone had taken it; Selene said "'they'" had her in a room, they were threatening her, and she could not leave; Selene told "Juan" not to hurt her, that she believed he was good, and asked that he let her go to her mother; and Mrs. Mayoral told Selene to tell the man who had her to return her or she would call the police. He argues admission of this evidence without "a nontruth instruction" violated his right to due process. He contends it was inadmissible hearsay and, even if nonhearsay, should have been excluded as unduly prejudicial pursuant to Evidence Code section 352.

The Attorney General does not address the hearsay issue, but her citation of authorities suggests she views all of these statements as nonhearsay. She contends the statements were relevant to defendant's mental state "because it showed [defendant] had a motive to kill Selene, i.e., he believed he would be accused of harming or keeping her against her will."

The Attorney General also argues that the prosecutor did not argue the challenged statements for their truth. A review of the prosecutor's arguments, however, reveals that he argued the truth of these statements by arguing, "She wants to go home"; "She's locked up and she cannot leave. Juan is trying to take the phone from her. She's talking to him in the background"; "Selene stops talking and the mom hears her scream as the phone call ends. What's happening is the defendant is telling Selene, call your mom and tell her to stop what she's doing, that you're going home. That's what's happening. And once she says, I'm okay, and the message is given to the mother the phone is taken away so nothing else is said"; and, "Her phone is taken away. We know that because the mom heard it happen, told her, I can't call you my phone is taken away."

15

### a. Pertinent principles of law

An out-of-court statement that is offered to prove the truth of the matter stated therein constitutes hearsay and is inadmissible absent an applicable exception. (Evid. Code, § 1200.)

"Evidence of a statement of a declarant's state of mind, when offered to prove or explain the declarant's conduct, is admissible, as long as the statement was made under circumstances indicating its trustworthiness. (Evid. Code, §§ 1250, subd. (a)(2), 1252.) A prerequisite to this exception is that the [declarant] victim's mental state or conduct be placed in issue. [Citation.] Evidence of the murder victim's fear of the defendant is admissible when the victim's state of mind is relevant to an element of an offense. [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1114 (*Guerra*) [finding victim's state of mind relevant to disprove consent in context of attempted rape felony-murder theory and special circumstance allegation], disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) If the victim's conduct in conformity with his or her fear is not in dispute, statements reflecting the victim's state of mind are irrelevant. (*People v. Jablonski* (2006) 37 Cal.4th 774, 819; *People v. Noguera* (1992) 4 Cal.4th 599, 621–622.) "[E]vidence of the decedent's state of mind, offered under Evidence Code section 1250, can be relevant to a defendant's motive—but only if there is independent, admissible evidence that the defendant was aware of the decedent's state of mind before the crime and may have been motivated by it." (*People v. Riccardi* (2012) 54 Cal.4th 758, 820.)

"An out-of-court statement is properly admitted if a nonhearsay purpose for admitting the statement is identified, and the nonhearsay purpose is relevant to an issue in dispute." (*People v. Turner* (1994) 8 Cal.4th 137, 189, overruled on another ground in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.)

We review any ruling on the admissibility of evidence for abuse of discretion. (*People v. Elliott* (2012) 53 Cal.4th 535, 577.)

16

**b.      Error by the trial court in admitting the challenged statements was harmless**

Only defendant's state of mind was in issue in this case, not that of Selene or her mother. While all of Selene's statements, if admitted for their truth, tended to show misconduct by someone, possibly defendant, neither the prosecutor nor the Attorney General established the applicability of any hearsay exception. Notably, the Attorney General does not rely upon Evidence Code section 1250, perhaps because there was no independent, admissible evidence that the defendant was aware of Selene's state of mind before the crime and may have been motivated by it. Although the Attorney General argues defendant was "confronted" by the prosecutor "about his statement to his sister during a telephone call after his arrest that Graciela had him investigated," defendant said he did not remember it, even after being shown a transcript. The prosecutor did not follow up by introducing a recording or other evidence of that phone call to prove defendant made the statement about which he was "confronted." Accordingly, no evidence of such a statement was introduced, and jurors were instructed that attorneys' "questions are not evidence. Only the witnesses' answers are evidence." (CALCRIM No. 222.)

At most, only two of the challenged statements could be viewed as nonhearsay relevant to defendant's state of mind: Mrs. Mayoral's statement directing Selene to tell the man who had her to return her or Mrs. Mayoral would call the police and Selene's statement telling Juan not to hurt her, etc. These statements were potentially admissible to demonstrate their effect upon defendant when he heard them, if in fact he did hear them. (*People v. Marsh* (1962) 58 Cal.2d 732, 737–738; *People v. Bolden* (1996) 44 Cal.App.4th 707, 715.)

For the reasons set forth with respect to the preceding issue, any error in admitting these statements would be harmless beyond a reasonable doubt given the evidence of the ligature marks on Selene's neck—testimony far more damaging than Mrs. Mayoral's testimony regarding Selene's statements in defendant's apartment.

17

### 3.      Instructions regarding gang evidence

Defendant contends that aspects of CALCRIM No. 1403, regarding the use of gang evidence, and CALCRIM No. 332, regarding testimony by an expert witness, permitted the jury improperly to consider the gang evidence for purposes other than proof of the gang enhancement allegation.

As given in defendant's trial, CALCRIM No. 1403 stated:  "You may consider the evidence of gang activity only for the limited purpose of deciding whether:  [¶]  The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crime and enhancement; [¶] OR [¶] The defendant had a motive to commit the crimes charged; [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion.  [¶]  You may not consider this evidence for any other purpose.  You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

Defendant contends that this instruction erroneously permitted the jury to consider evidence of gang activity with respect to "intent to kill and knowledge for implied malice (versus accident or involuntary manslaughter)."  He further argues the instructions failed to "specify and segregate the various types of gang and other crimes evidence admitted for various purposes," thus allowing the jury to consider matters such as the expert's testimony regarding primary activities and predicate offenses on all the intent and mitigation issues.  He also complains the trial court failed to instruct jurors "they could not consider other crimes or gang activities that were not at least proven to a preponderance."  In addition, he argues the trial court should have instructed the jury that "expert anecdotes and other hearsay references" were limited "to nontruth basis of opinion."  Defendant also contends it was improper to allow jurors to consider gang evidence with respect to his credibility as a witness.

Defendant also challenges CALCRIM No. 332, which provides in pertinent part: "Witnesses were allowed to testify as experts and to give opinions.  You must consider

the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

Defendant contends this instruction "permitted expansive substantive consideration even of gang expert testimonial hearsay and anecdotes (which is supposed to be limited to nontruth basis of opinion [citation]) by telling jurors they had to determine whether all the 'information' on which the expert relied was 'true and accurate.'"

### a.     Pertinent principles of law

A trial court in a criminal case is required—with or without a request—to give correct jury instructions on the general principles of law relevant to issues raised by the evidence, including the elements of an offense. (*People v. Acosta* (2014) 226 Cal.App.4th 108, 118.) A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested modification or amplification. (*People v. Lee* (2011) 51 Cal.4th 620, 638.) Purportedly erroneous instructions are reviewed in the context of the entire charge to determine whether it is reasonably likely the jury misconstrued or misapplied the challenged instruction. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1075.) "A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant." (*People v. Cross* (2008) 45 Cal.4th 58, 67–68.)

We independently assess whether instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

19

Evidence of gang affiliation and activity is admissible where it is relevant to an issue such as motive, intent, the truth of a gang enhancement allegation, or a witness's credibility. (*People v. Williams* (1997) 16 Cal.4th 153, 193; *People v. Gardeley* (1996) 14 Cal.4th 605, 619–620; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167– 1168 (*Samaniego*).)

### b. The instructions were not erroneous

CALCRIM No. 1403 correctly states the law both generally (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1168) and the law applicable to defendant's case. The murder charge was expressly alleged to be gang-related, and, pursuant to the prosecutor's theory, the gang evidence was relevant to defendant's intent and motive. Indeed, defendant expressly injected the gang element into the case through his spontaneous postarrest statement regarding the murder of Deputy Blair and, to a lesser extent, making a gang hand sign while being photographed during booking for this crime. The gang evidence was also relevant to defendant's credibility because he denied that dumping Selene's body had anything to do with gang rivalries or promoting his gang, as the prosecution theorized and its gang expert testified. "By taking the stand, defendant put his own credibility in issue and was subject to impeachment in the same manner as any other witness." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139.)

There no reasonable likelihood the jury considered matters such as the expert's testimony regarding the gang's primary activities and other members' offenses with respect to defendant's mental state. The topics of primary activities and predicate offenses, as well as other matters required to find that Young Crowd constituted a criminal street gang were expressly addressed in the instruction on the elements of the gang enhancement (CALCRIM No. 1401), and the prosecutor explained to jury the purpose of the predicate offense testimony and primary activities evidence and even added that he did not mean to imply defendant was involved in those offenses. Moreover, defendant does not explain how or why a jury would view such testimony as relevant to his mental state, especially in light of the final sentence of CALCRIM No.

20

1403, which expressly prohibited the jury from concluding from the gang evidence that the defendant was a bad person or predisposed to commit crimes.

If defendant believed the instructions required modification or that limiting instructions were required, it was incumbent upon him to request such changes, additions, or other instructions. His failure to do so resulted in forfeiture of the issue on appeal. (*Guerra*, *supra*, 37 Cal.4th at p. 1138; *Hernandez*, *supra*, 33 Cal.4th at p. 1051.)

With respect to CALCRIM No. 332, we disagree that it "permitted expansive substantive consideration even of gang expert testimonial hearsay and anecdotes." The sentence upon which defendant principally relies tells the jury to "decide whether information on which the expert relied was true and accurate," not that "they had to determine whether all the 'information' on which the expert relied was 'true and accurate,'" as defendant contends. Reading the instruction as a whole, it would be clear to jurors that their consideration of the truth and accuracy of the information upon which the expert relied was for the sole purpose of determining the weight to give the expert's opinion testimony.

Finally, we note defendant suggests CALCRIM No. 332 violates the confrontation clause. The confrontation clause applies to admission of evidence, not instructions. Moreover, defendant never asserted a confrontation objection to admission of the gang expert's testimony. Accordingly, we do not further consider this argument.

**c.    Any instructional error regarding gang evidence was harmless beyond a reasonable doubt**

For the reasons set forth in the context of the trial court's denial of defendant's bifurcation motion, any error was harmless beyond a reasonable doubt. Notably, the jury's rejection of the gang enhancement allegation indicates the jury either did not find the gang expert's testimony credible, or it gave that testimony very little weight. It would be unreasonable to conclude that the jury utilized the gang expert's testimony with respect to issues and matters not specified by CALCRIM No. 1403. For all of the same reasons, counsel's failure to request modification of the instructions or limiting

21

instructions was not prejudicial and cannot support a claim of ineffective assistance of counsel.

**4.    Precluding consideration of intoxication with respect to implied malice**

Defendant also challenges CALCRIM No. 625 and the statute upon which it is based, section 29.4 (formerly section 22) on the ground they violate his rights to present a defense and equal protection.  Defendant contends the decisions rejecting identical claims were wrongly decided.

In pertinent part and as given at defendant's trial, CALCRIM No. 625 stated: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation, or the defendant fled intending to evade the deputy.  [¶] . . . [¶]  You may not consider evidence of voluntary intoxication for any other purpose."

**a.    Pertinent principles of law**

Section 29.4 (formerly section 22) provides as follows:

"(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition.  Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.

"(b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought.

"(c) Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance."

22

### b.    Defendant's claims have no merit

As defendant acknowledges, his contentions regarding the constitutionality of section 29.4, subdivision (b) were rejected in *People v. Timms* (2007) 151 Cal.App.4th 1292 and *People v. Martin* (2000) 78 Cal.App.4th 1107.  For the reasons stated in *Timms*, at pages 1299 through 1302, we conclude defendant's equal protection and right to present a defense (due process) claims have no merit.  CALCRIM No. 625 correctly states the law regarding voluntary intoxication (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1381), and defendant's challenge to it therefore lacks merit for the same reasons.

### 5.    Use of "may" in CALCRIM No. 625

Defendant also challenges the validity of CALCRIM No. 625 because it "provided only that the jury 'may' consider the evidence of voluntary intoxication," whereas defendant argues that to protect his right to a fair trial, the instruction should have told the jury that it "must" consider such evidence.

Reading the instruction as a whole and in light of the entire set of jury instructions, we conclude there was no reasonable likelihood that jurors understood the use of "may" in the instruction to mean they were free to disregard the evidence of voluntary intoxication.  CALCRIM No. 220 expressly instructed the jurors that in determining whether the prosecution proved its case beyond a reasonable doubt, they "must" consider all of the evidence.  In light of that directive, the combined use of "may" and "only" in the first two sentences of CALCRIM No. 625 served to convey a restriction on the permitted use of intoxication evidence, not a freedom to disregard it.  Indeed, merely giving the instruction served to focus the jury's attention on the evidence of defendant's alleged intoxication.  In addition, defendant's testimony regarding intoxication played a key role in defense counsel's arguments.  The prosecutor briefly addressed the same evidence in his arguments, but he never suggested the jury should disregard it.  Indeed, the prosecutor expressly urged the jury to consider defendant's testimony, but not to believe it.

## 6. Flight instruction

The trial court instructed the jury with CALCRIM No. 372, as follows: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

Defendant contends instructing on flight was error because defendant's "flight activity . . . said nothing about the nature or *degree* of his guilt or about *which* crime(s) he was fleeing from."

### a. Pertinent principles of law

"In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given." (§ 1127c.)

"To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence." (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.) The pattern flight instruction does not assume that flight was established, but instead permits the jury to make that factual determination and to decide what weight to give it. (*People v. Abilez* (2007) 41 Cal.4th 472, 522.) It also permits the jury to consider alternative explanations for that flight other than defendant's consciousness of guilt. (*People v. Avila* (2009) 46 Cal.4th 680, 710.) It "does not create an unconstitutional permissive inference or lessen the prosecutor's burden of proof." (*Ibid.*) It also "does not address the defendant's specific mental state at the time of the

24

offenses, or his guilt of a particular crime, but advises of circumstances suggesting his *consciousness that he has committed some wrongdoing*" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1160, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 ), and allows "'the jury to determine to which offenses, if any, the inference [of consciousness of guilt] should apply.' [Citation.]" (*Avila*, *supra*, 46 Cal.4th at p. 710.)

### b. Instruction with CALCRIM No. 372 was not error

After shooting Selene in front of Deputy Montes, defendant sped away from the scene, leading a number of sheriff's patrol cars on a chase during which defendant broke numerous traffic regulations. After defendant dumped Selene's body, he continued to flee, first by leading deputies on a high-speed freeway chase, and then on foot when he reached the vicinity of his apartment building, abandoning his car in the middle of the street with its lights on and engine running. This evidence amply supported instruction upon flight.

All of defendant's contentions regarding CALCRIM No. 372 have been rejected by the California Supreme Court as set forth *ante*.

### 7. Cumulative error

Defendant contends that reversal is required due to the cumulative effect of the errors he raises. His cumulative error claim has no greater merit than his individual assertions of error, which we have rejected or found to be harmless.

### 8. Number of prior prison enhancements

Defendant contends, and the Attorney General concedes, that he should have been sentenced for only two section 667.5, subdivision (b) enhancements, not four, because he served concurrent terms for three of the four convictions. Section 667.5, subdivision (b), provides for an enhancement "for each prior separate prison term" if other conditions are met. Defendant served only two separate prison terms for the four convictions alleged and found true by the jury. Accordingly, we strike two of the four enhancements and direct the trial court to issue an amended abstract of judgment.

25

## DISPOSITION

Two of the four Penal Code section 667.5, subdivision (b) enhancements imposed upon defendant are struck. Defendant's aggregate sentence is now 45 years to life. The judgment is otherwise affirmed. The trial court is directed to issue an amended abstract of judgment reflecting these changes.

NOT TO BE PUBLISHED.


                                                            BENDIX, J.*

We concur:


        CHANEY, Acting P. J.


        JOHNSON, J.

---

**\*** Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.